Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Theodore Maya (SBN 223242)
tmaya@ahdootwolfson.com
Alyssa Brown (SBN 301313)
abrown@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: 310.474.9111
Facsimile: 310.474.8585

Melissa Clark (*pro hac vice* to be filed)
mclark@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
521 5th Avenue, 17th Floor
New York, NY 10175
Telephone: 917.336.0171
Facsimile: 917.336.0177

*Attorneys for Plaintiff and the Proposed Class*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| **AIDS HEALTHCARE FOUNDATION**, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| **GOODRX, INC., GOODRX HOLDINGS, INC., CVS CAREMARK CORP., EXPRESS SCRIPTS, INC., MEDIMPACT HEALTHCARE SYSTEMS INC.,** and **NAVITUS HEALTH SOLUTIONS, LLC.,** | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff AIDS Healthcare Foundation ("AHF"), on behalf of itself and all others similarly situated, brings this action against defendants GoodRx, Inc. and GoodRx Holdings, Inc. (collectively, "GoodRx"), CVS Caremark Corp. ("CVS"), Express Scripts, Inc. ("Express Scripts"), MedImpact Healthcare Systems, Inc. ("MedImpact"), and Navitus Health Solutions, LLC ("Navitus") (collectively "Defendants") for violations of federal antitrust laws. AHF makes the following allegations upon personal knowledge as to the facts pertaining to itself, and upon information and belief, including the investigation of its counsel, as to all other matters.

## NATURE OF THE ACTION

1.     Defendants engaged in a coordinated scheme to artificially fix the reimbursement amounts paid to pharmacies for filling prescription drug claims.

2.     Their coordination with one another forces pharmacies to accept Defendants' lowest reimbursement rates for generic drugs—driving Defendants' own profits while eliminating competition against one another and collectively reducing payments to pharmacies like the ones operated by Plaintiff.

3.     Defendants operate in the pharmacy industry: GoodRx is a prescription discount card aggregator, and the other defendants—CVS, Express Scripts, MedImpact, and Navitus—are among the largest pharmacy benefit managers ("PBMs") in the country.

4.     PBMs serve as intermediaries between drug manufacturers and third-party payors ("TPPs"), like health insurance companies. They develop drug formularies, negotiate manufacturer rebates, administer prescription claims, establish pharmacy networks, conduct drug utilization reviews, and, in some cases, operating mail-order or specialty pharmacies. In essence, PBMs manage the pricing and reimbursement process by determining the amounts TPPs pay pharmacies for medications and coordinating payment claims with those pharmacies.

5.     Each of the PBM Defendants also operates its own prescription discount card program, which offers consumers the option to pay out-of-pocket for medications at discounted rates, without using their insurance benefits.

- 1 -

6.     Before the implementation of Defendants' coordinated scheme, if a discount card offered a lower price than the patient's insurance copay, the patient could choose to use the card instead and pay a lower price out-of-pocket, without applying their insurance benefits. PBMs collect a transaction fee from pharmacies for each discount card claim, and they do not reimburse the pharmacy, meaning the pharmacy's only income from such transactions is the discounted amount paid by the patient, minus the PBM's fee.

7.     This often led to financial losses for pharmacies, but many accepted the cards as a means of attracting and retaining customers. Over time, however, as PBMs gained dominant market positions, pharmacies were left with little choice but to participate in a PBM's discount card program, as doing so became a condition of remaining in that PBM's network and filling prescriptions for its insured members.

8.     GoodRx began as a platform that aggregates prescription discount card pricing. GoodRx scans participating pharmacy networks to gather, analyze, and display pricing information from multiple PBMs' discount card offerings. This allows consumers to visit GoodRx's website or use its mobile app to identify whether a lower-cost option is available compared to what they would pay through their insurance plan. If a cheaper discount card price is available, the consumer can elect to fill the prescription using that discount, even if it is not through their insurance's PBM. For every transaction initiated through its platform, GoodRx earns a share of the fee that the pharmacy pays to the PBM.

9.     However, beginning in or around 2023, GoodRx unveiled new collaborations with the PBM Defendants that significantly altered the function of discount cards in the prescription drug ecosystem and substantially increased the volume of prescriptions routed through such cards.

10.    These partnerships, sometimes referred to as GoodRx's Integrated Savings Program ("ISP"), introduced an automated process that takes place without the patient's awareness or consent.

11.    When a covered individual fills a prescription, their PBM uses GoodRx's software to check whether a different PBM's discount program offers a lower price than

what the patient would otherwise owe under their insurance plan or their own PBM's discount offering. If a lower price is found, the transaction is redirected to the PBM offering that lower discount, and the discounted price is applied toward the patient's deductible. The pharmacy, however, is assessed a transaction fee for the discount card usage, which is divided among the original PBM, the PBM processing the transaction, and GoodRx. Because this transaction bypasses traditional insurance reimbursement, the revenue comes only from the retail amount paid directly by the patient, leaving the pharmacy with significantly reduced compensation.

12.     Through the ISP, PBMs are able to capture a portion of the patient's payment at the point of sale for each discount card transaction, without providing any reimbursement to the pharmacy, as would occur in a standard insurance-based transaction. This structure makes discount card claims significantly more lucrative for PBMs, particularly when it comes to generic medications. By shifting more prescription fills to discount card programs, PBMs increase their share of prescription drug revenues, while independent pharmacies are left with even less income to cover operating costs. For many of these pharmacies, who lack the backing of affiliated PBMs to offset lost revenue, these anticompetitive agreements threaten their survival.

13.     Through GoodRx's ISP, each of the PBM Defendants essentially agrees to share competitively sensitive data with GoodRx. Leveraging this information, GoodRx acts as a centralized pricing authority, setting the reimbursement rates that PBMs pay to independent pharmacies for dispensing generic medications.

14.     Rather than competing on price in the relevant market as they should, the PBM Defendants, who are horizontal competitors, collaborate to avoid underbidding one another for generic drug reimbursements.

15.     Under the ISP arrangement, GoodRx and the PBM Defendants jointly utilize GoodRx's proprietary pricing algorithm to calculate reimbursement amounts for prescriptions filled by patients covered through TPPs. Pharmacies are then required to accept the artificially low, supracompetitive rate—the lowest amount offered by any

CLASS ACTION COMPLAINT

participating PBM (referred to as the "ISP Rate"). This arrangement effectively eliminates price competition between GoodRx's discount services and the PBM Defendants.

16.    Absent the ISP arrangement, the PBM Defendants would be required to compete with one another, and with GoodRx, for the participation of independent pharmacies like Plaintiff and the Class Members. This competition would involve offering more favorable rebates and higher reimbursement rates for generic drugs than those offered by rival PBMs.

17.    Instead, the ISP scheme enables these entities to avoid such competition, resulting in economic harm to independent pharmacies, which are forced to accept reduced reimbursement rates and rebates from TPPs. Given the dominant market positions held individually and collectively by the PBM Defendants, and GoodRx's central role in the ISP, independent pharmacies have virtually no choice but to accept these disadvantageous terms.

18.    Meanwhile, GoodRx and the PBM Defendants reap significant rewards: (1) GoodRx receives a portion of each transaction processed through the ISP, and (2) the PBMs eliminate competition in the relevant market.

19.    This conduct has directly harmed independent pharmacies like Plaintiff and Class Members by reducing the reimbursement they receive for dispensing generic medications and increasing the fees they must pay to PBMs and GoodRx in connection with discount card transactions. These financial pressures have forced hundreds of independent pharmacies to close their doors, reducing competition in the prescription drug dispensing market. Ultimately, it is consumers who bear the burden, as the erosion of competition results in fewer available pharmacy options, a decline in service quality, and escalating healthcare costs.

## JURISDICTION AND VENUE

20.    Plaintiff brings this action to remedy violations of Section 1 of the Sherman Antitrust Act. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331

and 1337(a), as this action arises under Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

21.    Venue is appropriate pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) because Defendants conduct business within this District, and a significant portion of the conduct underlying Plaintiff's claims took place here, including the administration of prescription drug dispensing services and the implementation of GoodRx's discount card programs.

22.    This Court has personal jurisdiction over Defendants because, among other reasons, they (1) conducted business across the United States, including within this District; (2) are headquartered or otherwise maintain significant contacts in the United States and specifically in this District; and/or (3) participated in an unlawful anticompetitive scheme aimed at, and intended to inflict harm upon, individuals and businesses residing, operating, or located in the United States, including within this District.

23.    Venue is proper in this District because the Defendant GoodRx maintains its residence here, is licensed to conduct business within the District, and a significant portion of the interstate commerce at issue in the relevant markets took place within this jurisdiction.

## **PARTIES**

24.    **Plaintiff AIDS Healthcare Foundation** is a global nonprofit organization, headquartered in Los Angeles, California, whose services include a network of pharmacies.

25.    AHF generates innovative ways of treating and addressing barriers to care for its clients through a network of pharmacies, thrift stores, health and wellness centers, affordable housing locations, and food-service programs. For instance, AHF operates an array of non-profit health services, including healthcare and wellness centers and pharmacies.

26.     It offers cutting edge medicine and advocacy, regardless of ability to pay, and serves over two million patients in forty-seven countries. It operates over sixty pharmacies in the United States. As a not-for-profit, ninety-six cents of every dollar made at its pharmacies provide specialty HIV care.

27.     As a result of the allegations contained herein, including the ISP scheme perpetrated by Defendants, AHF was harmed by receiving reduced reimbursement rates for dispensing generic medications and/or incurring heightened fees payable to PBMs. These economic injuries were caused by an unlawful price-fixing conspiracy that denied Plaintiff access to competitive rebates and fair reimbursement rates for generic prescription drugs. Such harm falls squarely within the scope of injuries the federal antitrust laws are designed to prevent.

28.     **Defendant GoodRx, Inc**. is a Delaware corporation with its principal place of business located in Santa Monica, California. GoodRx, Inc. is a wholly owned subsidiary of GoodRx Intermediate Holdings, LLC, which, in turn, is wholly owned by **Defendant GoodRx Holdings, Inc.** GoodRx, Inc. conducts business both within this District and across the United States.

29.     **Defendant CVS Caremark Corporation** is incorporated in Delaware and maintains its principal executive offices in Woonsocket, Rhode Island. As a PBM, CVS operates as a wholly owned subsidiary of CVS Health Corporation ("CVS Health"). CVS Health also owns several other healthcare entities, including CVS Pharmacy, CVS Specialty Pharmacy, and Aetna, Inc., the third-largest health insurance provider in the country. CVS conducts business both within this District and nationwide.

30.     **Defendant Express Scripts Inc.** is a Delaware corporation with its principal place of business in St. Louis, Missouri. It operates as a PBM and is a wholly owned subsidiary of The Cigna Group. The Cigna Group also owns Cigna Healthcare, one of the largest health insurers in the country, as well as Evernorth Health Services, which runs a mail-order pharmacy, a specialty pharmacy, and a specialty pharmaceutical distribution

business. Express Scripts conducts business both in this District and across the United States.

31.     **Defendant MedImpact Healthcare Systems, Inc.** is a California corporation with its principal offices located in San Diego, California. MedImpact operates as a PBM and is a wholly owned subsidiary of MedImpact Holdings, Inc. Among the other subsidiaries of MedImpact Holdings are Birdi, Inc., which provides mail-order pharmacy services, and Specialty by Birdi, a specialty pharmacy. MedImpact conducts business throughout the United States, including in this District.

32.     **Defendant Navitus Health Solutions, LLC** is a Wisconsin corporation with its principal place of business in Madison, Wisconsin. Navitus operates as a PBM and is jointly owned by SSM Health, a major healthcare system with facilities across multiple states, and Costco Wholesale Corporation, the world's third-largest retailer. Costco operates more than 550 pharmacy-equipped warehouse locations throughout the United States.

## FACTUAL ALLEGATIONS

### Prescription Drug Transactions and PBMs

33.     PBMs initially acted as pharmaceutical claims processors, overseeing prescription drug benefits when a prescriber transmits a prescription to a patient's pharmacy.

34.     Now, they hold a multitude of roles in the pharmaceutical industry—not only operating their own pharmacies or being integrated into healthcare conglomerates alongside providers and insurers—but controlling the prices that patients pay, which pharmacies they can use, and how much those pharmacies earn on each prescription.

35.     The PBM Defendants conduct business within a highly consolidated industry. Together, Caremark and Express Scripts handle the majority of prescription claims in the United States. CVS Caremark and Express Scripts, alongside Optum Rx (collectively known as the "Big 3" PBMs), account for over 80% of all prescriptions processed nationwide. When factoring in Humana, Prime Therapeutics, and MedImpact,

which round out the "Big 6" PBMs, these entities manage more than 95% of prescription transactions across the country.

36.    In recent decades, PBMs, including the PBM Defendants, have pursued extensive vertical integration, aligning themselves with entities throughout the prescription drug supply chain, including pharmacies, health insurers, healthcare providers, and drug private labelers. As a result, these consolidated enterprises wield immense control over both the availability and cost of prescription medications in the United States. Each PBM Defendant is now a wholly owned subsidiary of a major healthcare conglomerate that also owns various other participants in the prescription drug dispensing market.

37.    Years of aggressive consolidation have enabled the largest PBMs, and their affiliated insurers and pharmacy operations, to accumulate substantial market power. This dominance extends over independent pharmacies, unaffiliated insurance companies, other industry stakeholders, and the patients whose healthcare access and costs are affected by their decisions.

38.    Indeed, last year, the Federal Trade Commission accused certain PBMs, including defendants CVS and Express Scripts, of abusing their economic power to force patients to pay more for life-saving medication while driving up their own profits.[1] The FTC has been engaged in a study of PBMs "and their impact on access to and affordability of medicine," noting "increasing vertical integration and concentration" as "these powerful middlemen may be profiting by inflating drug costs and squeezing Main Street

---

[1] *See, e.g., FTC Sues Prescription Drug Middlemen for Artificially Inflating Insulin Drug Prices*, Federal Trade Commission, (Sept. 20, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/09/ftc-sues-prescription-drug-middlemen-artificially-inflating-insulin-drug-prices.

pharmacies."[2] The FTC has continued its investigation of PBMs—and their control and abuse of the market—into 2025.[3]

39.    In recent years, PBMs have identified yet another way to leverage their market dominance for profit while stifling competition: through the expansion of discount card programs.

40.    Traditionally, prescription discount cards were intended to help individuals without insurance, or whose insurance didn't cover specific medications, access more affordable prescription drugs. PBMs began developing their own discount card programs by negotiating direct, or "cash network," pricing with pharmacies (pricing that falls outside typical insurance reimbursement structures) and then partnering with marketing firms to promote these cards to consumers.

41.    Pharmacies often accepted select discount cards in hopes of attracting and retaining customers, despite the fact that such transactions typically resulted in financial losses, as customers frequently paid less than the cost of the medication, and the PBMs took a fee from the pharmacy's portion of the sale. Unlike discounts provided by manufactures, Defendants' discount cards did not result in reimbursements to the pharmacies for the discount provided to the patient.

42.    Historically, pharmacies agreed to honor these discount cards under the belief that they would serve as a tool to draw in new business and that their use would be limited to situations where prescriptions weren't covered by insurance, Medicare, or Medicaid.

---

[2] *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies*, Federal Trade Commission, Interim Staff Report, FTC Interim Staff Report, (July 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf.
[3] *See, e.g., Specialty Generic Drugs: A Growing Profit Center for Vertically Integrated Pharmacy Benefit Managers*, Federal Trade Commission, Second Interim Staff Report, (Jan. 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/PBM-6b-Second-Interim-Staff-Report.pdf.

43.     However, as the largest PBMs consolidated market control and recognized the substantial revenue potential of discount card transactions, they began conditioning network participation on the acceptance of all their affiliated discount card programs. Pharmacies now must accept every discount card associated with a PBM to remain in-network and eligible to fill prescriptions for insured patients, even when doing so means incurring losses on a significant number of those transactions.

**GoodRx and the ISP**

44.     GoodRx began as a platform designed to aggregate and compare prescription discount card pricing. The company analyzes price data from major PBMs to identify which discount card offers the lowest price for a given medication. If the discount card price is lower than what a patient would pay out-of-pocket through their insurance, the patient can choose to use the discount card instead. In doing so, the transaction bypasses the patient's insurance entirely.

45.     At the heart of GoodRx's business is the collection and analysis of prescription pricing data, which it processes through a proprietary pricing engine. As noted in its most recent Annual Report, GoodRx's "price ingestion technology enables [it] to link with multiple sources spanning the healthcare industry," and the company holds patents covering its system for collecting and normalizing PBM pricing data and presenting it to consumers through a unified interface.

46.     Historically, consumers had to proactively check GoodRx before filling a prescription and present the chosen discount card at the pharmacy. When the pharmacy processed the claim, it would do so through the PBM offering the selected discount, rather than the PBM tied to the patient's insurance plan. For each of these transactions, the PBM collected a fee from the pharmacy, a portion of which was then shared with GoodRx. According to public filings, GoodRx earns approximately 15% of the patient's total retail prescription cost for each such transaction.

47.     In these transactions, there is no reimbursement from a health plan or TPP as would occur in a standard insurance claim. Instead, the patient bears the full cost at the

CLASS ACTION COMPLAINT

point of sale, and the revenue received by the pharmacy, GoodRx, and the PBM is derived entirely from the retail price paid by the patient.

48.     Amid growing investor scrutiny and financial losses between fiscal years 2022 and 2023, GoodRx abandoned its traditional role as a competitive alternative to PBMs and instead decided to participate in an unlawful arrangement aimed at driving down rebate amounts and reimbursement rates for generic medications paid to independent pharmacies.

49.     This scheme was first publicly disclosed during a November 8, 2022, earnings call, when GoodRx announced the launch of its ISP, which was slated to begin in early 2023.

50.     These agreements grant "automatic access" to GoodRx's pricing for generic medications. That is, the discounted rates made available through PBMs' discount card programs. As stated in the related announcements, the amount the patient pays under these arrangements is applied toward the patient's insurance deductible or out-of-pocket maximum.

51.     Express Scripts was identified as the first PBM Defendant to partner with GoodRx under the ISP. As part of this arrangement, Express Scripts provided GoodRx with competitively sensitive and proprietary pricing data for generic drugs, which GoodRx then used to incorporate its discount card services into Express Scripts' broader pharmacy benefits infrastructure.

52.     Each of the PBM Defendants entered the ISP scheme with GoodRx: Express Scripts in February 2023 with "Price Assure"; CVS in July 2023 with "Caremark Cost Saver"; MedImpact in September 2023; and Navitus in October 2023 with "Savings Connect."

53.     These partnerships have created a new transaction process that is triggered when a customer fills a prescription.

54.     Instead of reimbursing the pharmacy and submitting the claim to the patient's health insurer, the patient's PBM uses GoodRx's software to evaluate whether any other

PBM's discount card program offers a lower price than what the patient would otherwise pay under their insurance plan.

55.     If a lower price is identified, the transaction is redirected to the PBM offering that discount, and the discounted amount is applied both to the transaction and to the patient's deductible. The pharmacy is then charged a fee for the discount card transaction, which is divided among the patient's PBM, the PBM processing the claim, and GoodRx.

56.     These collaborations function as price-fixing arrangements that allow the PBM Defendants to access competitive pricing data from one another, ensuring that pharmacies receive the lowest possible reimbursement on each transaction.

57.     As a result, these agreements are expected to significantly increase the volume of prescriptions processed through discount card programs rather than traditional insurance claims.

58.     By focusing on generic drugs, a primary revenue source for independent pharmacies, Defendants are targeting a critical financial lifeline for these businesses.

59.     Unlike standard insurance transactions, PBMs retain a portion of the patient's payment at the point of sale by collecting a fee from the pharmacy for every discount card transaction. This makes discount card transactions more profitable for PBMs than those processed through insurance.

60.     By pooling discount card pricing information and routing prescriptions to the PBM offering the lowest reimbursement, the Defendants maximize the number of transactions processed through discount cards—boosting their profits while simultaneously depriving pharmacies of essential revenue tied to conventional insurance reimbursements.

**Defendants' Actions Have Harmed Competition**

61.     Defendants' ISPs constitute unlawful price-fixing arrangements that suppress pharmacy reimbursement rates for generic drugs to artificially low levels (specifically, the lowest price available through GoodRx for each prescription subject to these programs).

- 12 -

62.    In the absence of such agreements, the PBM Defendants would be required to compete with one another to include pharmacies in their respective retail networks, offering more favorable reimbursement rates as an incentive. Instead, these programs eliminate that competition by granting each PBM Defendant access to the sensitive discount card pricing of its rivals and enabling them to unilaterally select the lowest available rate to reimburse pharmacies, thereby fixing prices and undermining market-based negotiation.

63.    Independent pharmacies are typically not certain of the reimbursement amount they will receive from PBMs until a claim is actually processed. The reimbursement system is further complicated by a lack of transparency and frequent retroactive adjustments: PBMs often impose additional fees or recoup payments weeks or even months after the original transaction.

64.    As a result, many independent pharmacies are unable to identify reduced reimbursements or elevated fees imposed by the PBM Defendants until after the prescription has already been dispensed, making it nearly impossible to anticipate or manage these financial impacts in real time.

65.    Independent pharmacies lack access to the revenue streams that PBMs and their affiliated pharmacy operations derive from their vertically integrated business structures and market dominance. This imbalance creates a structural advantage for PBM-affiliated pharmacies, which are able to use these additional sources of income, often bolstered by monopoly-level profits, to offset losses from traditional prescription dispensing. Independent pharmacies, by contrast, have no such safety net, and PBMs are fully aware of this disparity.

66.    As a direct consequence of the PBM Defendants' anticompetitive practices, a growing number of independent pharmacies have been forced to shut down, further diminishing competition and reinforcing the market dominance of vertically integrated PBMs such as the Defendants.

CLASS ACTION COMPLAINT

67.   The implementation of the ISPs by GoodRx and the PBM Defendants has inflicted yet another financial hit on these independent businesses. The combination of reduced reimbursement rates and increased fees payable to Defendants has resulted in a direct shift of prescription dispensing revenue from independent pharmacies to the Defendants themselves. This steady erosion of revenue is driving independent pharmacies toward insolvency and closure.

68.   In 2023, independent pharmacies closed at a rate of approximately one per day. That rate of closure is expected to accelerate as discount card transactions continue to rise and place additional strain on these already-vulnerable businesses.

69.   Defendants' conduct has resulted in widespread closures of independent pharmacies, which diminishes the quality of care available to patients. Independent pharmacies are often a source of meaningful innovation, as their smaller scale allows for quicker adoption of new technologies and patient-focused services. In contrast, pharmacy chains owned by large healthcare conglomerates are frequently hindered by organizational complexity, making system-wide implementation of new tools and practices costly and time-consuming.

70.   Local pharmacies are also deeply embedded in the communities they serve and often develop close relationships with patients, particularly those who need assistance managing complex medication regimens or who require specialized, personalized care. This individualized service model offers significant value, especially to vulnerable populations.

71.   In rural and underserved regions, which large chains often neglect due to lower profit margins, independent pharmacies frequently serve as the primary, if not the only, source of healthcare access, including prescription drug dispensing. These pharmacies often function as critical healthcare hubs for patients in those areas.

72.   Independent pharmacies have long relied on their ability to offer flexible, personalized care as a competitive advantage over national chains. That avenue of

competition is now being eroded, and increasingly eliminated, by the anticompetitive behavior at the heart of this action.

## MARKET DEFINITION AND MARKET POWER

73.   The relevant market in this case is the market for pharmacy reimbursements for prescription drug dispensing services provided by network pharmacies within the United States (the "Relevant Market").

74.   In the Relevant Market, pharmacies supply dispensing services, while the PBM Defendants purchase those services on behalf of TPPs, including health insurers.

75.   The anticompetitive conduct described herein, most notably, the suppression of pharmacy reimbursement rates, demonstrates that Defendants possess substantial market power within the Relevant Market.

76.   This Relevant Market satisfies the standard for market definition under the hypothetical monopolist, or SSNIP, test. The SSNIP test evaluates whether a hypothetical monopolist in the identified market could impose a small but significant non-transitory increase in price (typically around 5%) without losing so many customers to alternatives that the price hike would become unprofitable.

77.   Here, the concentration of market control supports the conclusion that such pricing power exists: the "Big 3" PBMs (including two of the Defendants) process nearly 80% of prescription drug claims nationwide, up from 70% in 2016. The "Big 6" PBMs (which include three PBM Defendants) account for over 90% of claim processing. Collectively, the PBM Defendants alone manage pharmacy benefits for more than 60% of the eligible U.S. population.

78.   As a result, pharmacies have little choice but to participate in the networks of these dominant PBMs. Each PBM Defendant is also a wholly owned subsidiary of a vertically integrated healthcare conglomerate that owns entities such as mail-order, retail, and specialty pharmacies, major health insurers, and other key players in the prescription dispensing supply chain.

CLASS ACTION COMPLAINT

79.     The relevant geographic market is the entire United States. The structure and regulation of the American healthcare system, particularly as it relates to pharmacy reimbursements, are governed by a distinct framework of federal and state laws applicable only within the United States. The market cannot be meaningfully narrowed geographically, as pharmacy reimbursements are dictated by PBMs that operate nationwide.

80.     Both collectively and individually, the Defendants possess market power sufficient to harm competition within the Relevant Market.

## CLASS ALLEGATIONS

81.     Plaintiff brings this lawsuit under Fed. R. Civ. P. 23(a), (b)(2) and (b)(3) as representatives of the following class (the "Class"):

> All pharmacies in the United States who dispensed generic pharmaceuticals and were reimbursed pursuant to the GoodRx ISP during the relevant statutory period.

82.     Excluded from the Class are (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) all jurors assigned to this case; (3) Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and their current or former employees, officers, and directors; and (4) Plaintiff's counsel and Defendants' counsel.

83.     Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

84.     **Numerosity:** The Class is so numerous as to make joinder impracticable. Plaintiff does not know the exact number of Class Members, because such information si presently in the exclusive control of Defendants. However, Plaintiff estimates that there are likely thousands of Class Members in the United States, at least.

85.     **Commonality and Predominance:** Common questions of law and fact exist with regard to each of the claims and predominate over questions affecting only individual Class members. Questions common to the Class include, but are not limited to:

    a.  Whether Defendants engaged in anticompetitive acts aimed at unreasonably restraining competition in the Relevant Market;

    b.  Whether such acts violated federal antitrust laws;

    c.  Whether the Defendants' conduct caused injury to Plaintiff and other Class Members;

    d.  The appropriate class-wide measure of damages; and

    e.  The nature of appropriate injunctive relief to restore competition in the Relevant Market.

86.     **Typicality**: Plaintiff's claims are typical of the claims of Class Members in that Plaintiff, like all Class members, has been injured by Defendants' misconduct.

87.     **Adequacy of Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, including antitrust class actions. Plaintiff does not have any interests antagonistic to those of the Class.

88.     **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce Defendants to comply with federal law. Moreover, because the amount of each individual Class Member's claim is small relative to the complexity of the litigation, and because of Defendants' vast financial resources, Class members are unlikely to pursue legal redress individually for the violations detailed in this complaint. A class action will allow these claims to be heard where they would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

CLASS ACTION COMPLAINT

89. **Injunctive relief:** Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of Sections 1 of the Sherman Act, 15 U.S.C. § 1
### (Price Fixing)

90. Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

91. Defendants entered into and engaged in a continuing combination, contract, or conspiracy in restraint of trade or commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing, fixing, maintaining, or stabilizing the prices of, and overall reimbursements for, dispensing prescription generic drugs paid to Plaintiff and members of the Class at artificially low levels.

92. Plaintiff and members of the Class have been injured and will continue to be injured in the form of under-reimbursement for prescription generic drugs.

93. Defendants' anticompetitive conduct had the following effects, among others:

   a. The reimbursements paid to pharmacies for prescription generic pharmaceuticals has been fixed, stabilized, or maintained at artificially low levels;

   b. Pharmacies have paid increased fees to Defendants; and

   c. Pharmacies have been deprived of the benefits of free and open competition between and among Defendants.

94. Defendants' activities constitute a *per se* violation of Section 1 of the Sherman Act.

95. Defendants' conduct lacks a non-pretextual procompetitive justification that offsets the harm caused by Defendant's anticompetitive and unlawful conduct. Moreover,

even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

96.     As a direct, substantial, and proximate result of Defendants' anticompetitive conduct, Plaintiff and Class Members have been injured in their business or property in an amount to be established at trial. Due to Defendants' conduct, Plaintiff and members of the Class are entitled to treble damages, injunctive relief, and attorneys' fees and costs pursuant to Section 4 and 16 of the Clayton Act, 15 U.S. Code §§ 15 & 26.

97.     Plaintiff and members of the Class are threatened with future injury to their business and property unless the injunctive relief requested is granted.

## SECOND CAUSE OF ACTION

### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
### (Agreement to Unreasonably Restrain Trade)

98.     Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

99.     In the alternative to Count 1, during the relevant periods, GoodRx and each of the PBM Defendants entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

100.    Together, the PBM Defendants wield significant market power within the Relevant Market.

101.    Each PBM Defendant, along with GoodRx, has entered into anticompetitive agreements that have harmed competition by driving down pharmacy reimbursement rates and suppressing prices paid to pharmacies, including Plaintiff and the proposed Class.

102.    The arrangements between GoodRx and the PBM Defendants constitute unlawful restraints of trade under Section 1 of the Sherman Act.

103.    By leveraging their collective market dominance, GoodRx and the PBM Defendants engaged in coordinated conduct that unreasonably restricted competition in the Relevant Market.

- 19 -

CLASS ACTION COMPLAINT

104.   Defendants' conduct lacks a non-pretextual procompetitive justification that offsets the harm caused by Defendant's anticompetitive and unlawful conduct. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

105.   As a direct, substantial, and proximate result of Defendants' anticompetitive conduct, Plaintiff and Class Members have been injured in their business or property in an amount to be established at trial. Due to Defendants' conduct, Plaintiff and members of the Class are entitled to treble damages, injunctive relief, and attorneys' fees and costs pursuant to Section 4 and 16 of the Clayton Act, 15 U.S. Code §§ 15 & 26.

106.   Plaintiff and members of the Class are threatened with future injury to their business and property unless the injunctive relief requested is granted.

## PRAYER FOR RELIEF

Plaintiff,  individually and on behalf of all others similarly situated, respectfully requests that the Court:

A.      Certify this case as a class action, and appoint Plaintiff as Class representative and the undersigned attorneys as Class Counsel;

B.      Adjudge and decree that Defendants have entered into a contract, combination, or conspiracy to fix, reduce, stabilize, or maintain reimbursements for prescription drugs at artificially low levels in violation of Section 1 of the Sherman Act;

C.      Enter judgment in favor of Plaintiff and the Class;

D.      Award all damages to which Plaintiff and Class Members are entitled, including treble damages under the Clayton Act;

E.      Award Plaintiff and Class Members pre- and post-judgment interest as provided by law;

F.      Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and Class Members, including enjoining and restraining Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in

CLASS ACTION COMPLAINT

any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

G.      Award Plaintiff and Class members reasonable litigation expenses and attorneys' fees as permitted by law; and

H.      Award such other and further relief as the Court deems necessary and appropriate.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all triable issues.

Dated: April 16, 2025                    Respectfully submitted,

*/s/ Tina Wolfson*
Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Theodore Maya (SBN 223242)
tmaya@ahdootwolfson.com
Alyssa Brown (SBN 301313)
abrown@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: 310.474.9111
Facsimile: 310.474.8585

Melissa Clark (*pro hac vice* to be filed)
mclark@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
521 5th Avenue, 17th Floor
New York, NY 10175
Telephone: 917.336.0171
Facsimile: 917.336.0177

*Attorneys for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT